Filed 3/19/13  P. v. Herrera CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDREW MARK HERRERA,<br><br>    Defendant and Appellant. | D061139<br><br><br>(Super. Ct. No. SCN290154) |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Reversed in part, affirmed in part.

A jury found Andrew Mark Herrera guilty of one count of first degree burglary, (Pen. Code, § 459);[1] one count of assault with a deadly weapon (§ 245, subd. (a)(1)); one count of making a criminal threat (§ 422); and one count of attempting to make a criminal threat (§§ 422, 664).  The jury also made true findings that Herrera personally used a

---

1    Unless otherwise indicated, all further statutory references are to the Penal Code.

deadly weapon during the burglary (§ 12022, subd. (b)(1)), and that he personally inflicted great bodily injury during the assault and the burglary (§ 12022.7, subd. (a)).

Herrera admitted a prior serious felony and a prior strike, and the trial court sentenced Herrera to prison for 17 years eight months.

Herrera contends (1) insufficient evidence supports his conviction for making a criminal threat; (2) the trial court prejudicially erred by giving an erroneous instruction on attempting to make a criminal threat; (3) the trial court prejudicially erred in instructing with CALCRIM No. 361, which applies when a defendant fails to explain or deny evidence against him; and (4) the special instruction on self-defense should have been expanded and clarified. As we will explain, we conclude that the first two arguments have merit. Accordingly, we reverse the judgment of conviction on count 4 for making a criminal threat, and on count 6 for attempting to make a criminal threat. In all other respects, we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Herrera appeals from a judgment following a jury verdict based on crimes that he committed on two separate dates in 2011.

A.      *The Kohl's Department Store Incident*

On March 28, 2011, Herrera and his girlfriend entered a Kohl's department store. They exited the store with Herrera wearing shoes and a hat that he did not pay for. Two store security guards — Victor Carrillo and Christopher Lindsey — confronted Herrera outside of the store and escorted him to an office where they had him return the items and

2

fill out paperwork. After initially being cooperative, Herrera became agitated. Herrera asked Carrillo and Lindsey if they valued their jobs, and he then stood up and put his hand behind his back as if he had a hidden weapon. Herrera stated he was a convicted felon and said something such as "Step the fuck back or I'll put a hole through your head." Carrillo and Lindsey felt threatened and scared, so they stepped aside and Herrera exited the office and left the store.

B.      *The Early Morning Burglary*

At approximately 2:30 a.m. on April 6, 2011, three men were sleeping in their bedroom in an apartment that was part of a sober living facility. The sliding door to the bedroom was open, leading out to the patio of the apartment complex. According to the testimony of one of the men, Darryl Duncan, he woke up when he heard Herrera rustling through the contents of the bedroom closet. Duncan, who did not know Herrera, walked up to Herrera and asked him what he was doing. Herrera claimed to be a security guard and then said he lived nearby.[2]

Believing that Herrera was burglarizing the apartment, Duncan tried to detain Herrera by grabbing him. Herrera fought back, leading to a prolonged scuffle between Duncan and Herrera. During the fight, Herrera hit Duncan repeatedly on the head with

---

[2]      Herrera was, in fact, living nearby, and he was an acquaintance of one of the apartment's residents, who had previously given cigarettes to Herrera when encountering him in the neighborhood. Herrera had come by the apartment about a month and a half before the burglary at 11:30 p.m. to ask for a cigarette, but he was turned away because it was too late.

an object that caused bleeding from several crescent-shaped lacerations to Duncan's scalp. Herrera also injured Duncan by punching him in the mouth and biting his fingers.

The owner of the property — Albert Rassel — arrived at the apartment and broke up the fight. After a call was placed to 911, Rassel tried to get Herrera to sit down and wait for the police. Herrera jumped up and went into the kitchen, where he grabbed a fork. Herrera then put down the fork and grabbed scissors. While holding the scissors, Herrera climbed on a couch and tried to open a window so he could exit the apartment, but he was unable to open the window enough to fit through. Herrera then changed his grip on the scissors so that he could use them for stabbing. At some point, Duncan picked up a small table with the intention of hitting Herrera with it to keep him from leaving. Rassel told Duncan to put down the table.

While wielding the scissors in a stabbing grip, Herrera spoke to Rassel who was standing two feet away and was blocking the door that led out of the apartment. Herrera stated to Rassel, "It's not worth it Doc. Get out of my road, or, I'm coming through . . . ." Rassel moved away from the door, and Herrera exited the apartment. Rassel was very scared during the incident because he thought that Herrera "was going to use that scissors to get through that door if I had to get stabbed to get out of the way." After Herrera left the apartment, Rassel no longer felt that he was in danger.

The police arrived and searched the neighborhood for Herrera using a canine unit. Herrera was located in a nearby house where he was living, hiding under the covers in a bed.

4

C.    *Proceedings*

Based on the incident at Kohl's, Herrera was charged with one count of burglary (§ 459), one count of making a criminal threat to Carrillo (§ 422), and one count of attempting to make a criminal threat to Lindsey (§§ 422, 664).[3] Based on the early morning intrusion at the apartment, Herrera was charged with first degree burglary (§§ 459, 460, subd. (a)), two counts of assault with a deadly weapon for the attacks on Rassel and Duncan (§ 245, subd. (a)(1)), and making a criminal threat to Rassel (§ 422).

Herrera testified at length during trial. As to the incident at Kohl's, Herrera admitted taking the hat and shoes without paying for them, but he did not admit to *entering* the store with the intent to commit any crime. Herrera also admitted that he put his hand behind his back and he threatened to put a hole in Carrillo and Lindsey if they did not let him leave the store. Concerning the early morning incident at the apartment, Herrera claimed that he was looking into the open bedroom sliding door to ask for a light to a partially smoked cigarette that he found on the patio. Herrera claimed that Duncan — thinking Herrera had taken Duncan's wallet — tackled Herrera from behind and pushed him into the house where the fight ensued. Herrera admitted picking up scissors and holding them out in front of him shortly before leaving the apartment, but he denied ever orally threatening Rassel.

---

3     At the preliminary hearing, based on Lindsey's testimony as to the short duration of the fear he experienced, the court determined that there was not sufficient cause for the prosecution to proceed against Herrera for making a criminal threat to Lindsey, but it allowed the prosecution to proceed on a theory that Herrera *attempted* to make a criminal threat to Lindsey (§§ 422, 664).

5

With respect to the Kohl's incident, the jury acquitted Herrera of burglary (§ 459) and found Herrera guilty of attempting to make a criminal threat to Lindsey (§§ 422, 664). The jury could not reach a verdict on the count charging Herrera with making a criminal threat to Carrillo, and the trial court declared a mistrial on that count and subsequently dismissed it at the request of the prosecution.

On the counts arising out of the early morning intrusion into the apartment, the jury found Herrera guilty of first degree burglary (§§ 459, 460), assault with a deadly weapon on Duncan (§ 245, subd. (a)(1)), and making a criminal threat to Rassel (§ 422). The jury also found that Herrera personally used a deadly weapon during the burglary (§ 12022, subd. (b)(1)), and that he personally inflicted great bodily injury during the assault and the burglary (§ 12022.7, subd. (a)). The jury could not reach a verdict on the count alleging assault with a deadly weapon on Rassel, and the trial court declared a mistrial on that count and then dismissed it. Herrera admitted a prior serious felony and prior strike. The trial court sentenced Herrera to prison for 17 years eight months.

II

DISCUSSION

A.    *Insufficient Evidence Supports the Conviction for Making a Criminal Threat*

We first consider Herrera's challenge to the sufficiency of the evidence to support his conviction for making a criminal threat to Rassel in violation of section 422.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value —

6

from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 60, citations omitted.)[4]

As set forth in section 422: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and

---

[4] Herrera also argues that the trial court erred in denying the motion for a judgment of acquittal (§ 1118.1) on count 4 that he made at the conclusion of the People's case-in-chief on the ground that the People had not proven that Rassel experienced sustained fear as a result of a criminal threat. "When reviewing a claim the trial court erred by denying a motion for acquittal under section 1118.1, we apply the same standard as when evaluating the sufficiency of evidence to support a conviction, except that we consider only the evidence in the record at the time the motion was made." (*People v. Roldan* (2011) 197 Cal.App.4th 920, 924.) Here, to the extent we conclude that substantial evidence does not support the verdict on count 4, we also conclude that the trial court should have granted the motion for a judgment of acquittal on that count.

thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished . . . ."

As our Supreme Court has explained, "[i]n order to prove a violation of section 422, the prosecution must establish all of the following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat — which may be 'made verbally, in writing, or by means of an electronic communication device' — was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) *that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,'* and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances."  (*People v. Toledo* (2001) 26 Cal.4th 221, 228 (*Toledo*), italics added.)  "[A]ll of the surrounding circumstances should be taken into account to determine if a threat falls within the proscription of section 422."  (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.)

Herrera challenges the sufficiency of the evidence supporting the fourth element (italicized above), namely that his threat actually caused Rassel to be in sustained fear for his safety.  To evaluate that argument we review the applicable case law.

Section 422 does not provide a definition of sustained fear.  In the absence of a statutory definition, the court in *People v. Allen* (1995) 33 Cal.App.4th 1149 (*Allen*), took

8

the approach of "[d]efining the word 'sustained' by its opposites," concluding "that it means a period of time that extends beyond what is momentary, fleeting, or transitory." (*Id*. at p. 1156.)  In *Allen*, the evidence supported a finding of sustained fear because the defendant was "armed, mobile and at large" for a sustained period of 15 minutes following a threat to kill the victim and her daughter (his ex-girlfriend) against whom he had a long history of stalking and domestic violence.  (*Id*. at pp. 1155-1156.)  Employing *Allen*'s definition of sustained fear, other cases have concluded that the evidence supported a finding of sustained fear because the victim experienced fear that was more than momentary, fleeting or transitory and therefore sufficiently long to satisfy the statute.  (See, e.g., *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1342; *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 (*Fierro*).)

In contrast, the court in *In re Ricky T.* (2001) 87 Cal.App.4th 1132 (*Ricky T.*) applied *Allen*'s definition of sustained fear but concluded that the evidence did *not* support a finding that the victim experienced sustained fear, as the fear "did not exist beyond the moments of the encounter."  (*Ricky T.*, at p. 1140.)  Specifically, in *Ricky T.*, immediately after being accidently hit by a door that a teacher swung open, the student cursed at the teacher and said, "'I'm going to get you.'"  (*Id*. at p. 1135.)  Although the teacher felt threatened during the confrontation and sent the student to the school office (*ibid*.), the only finding supported by the evidence was that the teacher's fear was momentary and lasted only during the short encounter.  Rejecting the "suggestion that even momentary fear can support a finding of sustained fear within the meaning of section 422," *Ricky T.* concluded that the evidence was insufficient to establish guilt

9

under section 422. (*Ricky T.*, at p. 1140.) "Whatever emotion — fear, intimidation, or apprehension — [the teacher] felt during the moment of the verbal encounter, there was nothing to indicate that the fear was more than fleeting or transitory." (*Ibid.*) The court rejected the argument that the dispositive factor "is not the *time* the fear is endured but that it *is*, in fact, suffered or established" (*ibid.*, italics added), reasoning that "if *any* experience of fear constitutes a 'sustained' experience, then the term is superfluous." (*Ibid.*, italics added.)

The most recent opinion to consider the sustained fear requirement is *Fierro*, *supra*, 180 Cal.App.4th 1342. In that case, the victim and Fierro had a disagreement at a gas station when Fierro refused to move his car. (*Id.* at pp. 1344-1345.) As the confrontation became heated, Fierro lifted his shirt to display what the victim and his teenage son thought was a gun. (*Id.* at pp. 1345-1346.) Fierro spoke profanely and in a hostile manner to the victim and then said, "'I should kill you. I will kill you,'" and indicated that he also "'ought to'" kill the victim's son. (*Id.* at p. 1346.) The time period while the weapon was displayed lasted about one minute, after which Fierro allowed the victim to drive away. (*Id.* at pp. 1346, 1349, fn. 5.) After driving for about 15 minutes, the victim called 911 from the freeway, telling the operator he was "'scared shitless.'" (*Id.* at p. 1346.) The victim returned to the gas station at the 911 operator's instructions, and the incident ended when the police arrived and detained Fierro, whom they located nearby. (*Ibid.*)

The court concluded that the evidence supported a finding that the victim experienced sustained fear. (*Fierro*, *supra*, 180 Cal.App.4th at pp. 1348-1349.) As the

court noted, the victim "testified clearly and more than once that he was horribly scared, and his fright was not fleeting." (*Id*. at p. 1348.)  The evidence was sufficient for a finding that "[t]he fear lasted not only through the minute or so that [Fierro] stood there exposing his weapon, but for up to 15 minutes after [the victim] drove away," and "[i]t is entirely reasonable that [the victim] would react as he did for as long as he did." (*Ibid*.)  As the court explained, even though the victim was not being physically threatened after he drove away, the jury could reasonably find that he was still in an emotional state of fear, as "a person who hears someone say 'I will kill you . . . right now,'" coupled with seeing a weapon, is quite justified in remaining 'scared shitless' — as [the victim] put it — for 15 minutes." (*Id*. at p. 1349.)  In a statement that was not necessary to its decision, and therefore dictum, the court explained that "even if" it accepted the appellant's argument that the only relevant time period was while the weapon was displayed, it believed "that the minute during which [the victim] heard the threat and saw appellant's weapon qualifies as 'sustained' under the statute.  When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.'" (*Ibid*.)

Applying these authorities, we conclude that, under any view of the evidence in this case, the fear experienced by Rassel was no more than momentary, fleeting or transitory, and therefore substantial evidence does not support a finding that Rassel experienced sustained fear.  As Rassel described the incident, after Herrera picked up and discarded a fork, grabbed scissors and then unsuccessfully tried to climb out a window, Herrera directed his attention to exiting through the front door.  Because Rassel was blocking the door, Herrera changed his grip on the scissors to a stabbing posture and told

11

Rassel, "It's not worth it. . . . Get out of my road, or, I'm coming through." Rassel was scared because he believed that Herrera was serious about doing whatever was necessary to get through the door, and Rassel therefore immediately stepped away from the door. Herrera promptly opened the door and ran off. Rassel stated that he felt relieved as he saw Herrera run out the door, and he no longer felt in danger once Herrera left.

Rassel was on the telephone with the 911 operator during the entire incident. The recording of the call reveals that the entire incident — during which Herrera picked up a fork and then scissors, tried to exit the window, turned his attention to the front door, threatened Rassel with the scissors and then ran out the door — lasted a total of 50 seconds. The time period during which Rassel was afraid of being stabbed with the scissors if he did not move away from the door was only a fraction of that 50 seconds. Because Rassel had the ability to — and did — immediately comply with Herrera's demand to step aside, Rassel's fear could not have lasted more than the few seconds that it took him to register the conditional threat and to defuse it by stepping aside.

It is difficult to conceive of a threat that would cause fear of a shorter duration than experienced by Rassel. This case is like *Ricky T.* in that we are compelled to echo the observation that "if any experience of fear constitutes a 'sustained' experience, then the term is superfluous." (*Ricky T.*, *supra*, 87 Cal.App.4th at p. 1140.) The only conclusion permitted by the evidence is that Rassel's fear was nothing more than "momentary, fleeting, or transitory" and therefore did not constitute sustained fear within the meaning of section 422. (*Allen*, *supra*, 33 Cal.App.4th at p. 1156.)

12

We need not consider whether we agree with *Fierro*'s dictum that some experiences of fear — even though lasting only a minute — are sufficient to constitute sustained fear, as this is clearly not such a case. In *Fierro*, the death threat was direct and unconditional. It was made by an angry and irrational person who appeared to have the immediate ability to carry it out and who would not let the victim leave. (*Fierro*, *supra*, 180 Cal.App.4th at pp. 1345-1346). All of those factors combined to create a fear that was intense and sustained over the course of a minute. Here, in contrast, Herrera's indirect threat of "It's not worth it" while wielding scissors was made for the sole and unambiguous purpose of persuading Rassel to step aside so that Herrera could leave the apartment. Rassel's fear lasted only for a few seconds because he immediately complied with Herrera's demand. Unlike in *Fierro*, Rassel had a *choice* to defuse the threat by stepping aside, and he *immediately* did so. This is simply not a situation fitting *Fierro*'s dictum that "[w]hen one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.'" (*Ibid*.)[5]

---

5     The Attorney General argues that the evidence was sufficient for a finding that Rassel experienced sustained fear because Rassel had seen the injuries that Herrera inflicted on Duncan. (See *Allen*, *supra*, 33 Cal.App.4th at p. 1156 ["The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear."].) We disagree. Rassel's awareness of Duncan's injuries was certainly persuasive evidence that Rassel had an *intense* fear of Herrera because he understood that Herrera was capable of inflicting violent injuries. But the *intensity* of Rassel's fear is a separate question from whether his fear lasted more than a few seconds as is required for a finding of *sustained* fear. Similarly, the Attorney General argues that this case is different from *Ricky T.*, *supra*, 87 Cal.App.4th 1132, in that the student in *Ricky T.* "made no physical movements or gestures in furtherance" of the threat, whereas in this case Herrera held "the scissors in preparation to slash and stab Rassel." This argument suffers from the same logical flaw. Herrera's grip on the scissors goes to the

13

We reverse Herrera's conviction in count 4 for making a criminal threat against Rassel on the basis that it is not supported by substantial evidence.[6]

B.   *The Trial Court Prejudicially Erred in Its Instructions on the Elements Required for an Attempt to Make a Criminal Threat*

In count 6, the jury found Herrera guilty of attempting to make a criminal threat against Lindsey in the Kohl's security office.  (§§ 422, 664.)  Herrera contends that the trial court prejudicially erred and violated his right to due process by not properly instructing the jury on each of the elements required to prove an attempt to make a criminal threat.

1.   *The Elements of Attempting to Make a Criminal Threat*

We begin by discussing the offense of attempting to make a criminal threat.

In a case expressly addressing the issue of whether the crime of attempting to make a criminal threat exists in California, our Supreme Court confirmed that such an offense exists, and it established the requirements for guilt, relying both on the law of attempt and the elements of the offense of making a criminal threat.  (*Toledo*, *supra*, 26 Cal.4th at p. 228.)

---

*intensity* of Rassel's fear; it does not show that Rassel suffered fear lasting more than a few seconds.

[6]    As we reverse the conviction on count 4 on the basis of insufficient evidence, we need not, and do not, consider Herrera's argument that a conviction for making a criminal threat would violate his right to equal protection in that he would be punished more harshly than a defendant in a similar position charged only with brandishing a weapon.

As *Toledo* explained, section 664 creates the offense of criminal attempt, stating in relevant part that "[e]very person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished where no provision is made by law for the punishment of those attempts . . . ."  (§ 664; see also *Toledo*, *supra*, 26 Cal.4th at p. 229 & fn. 5.)  Further, section 21a provides that "[a]n attempt to commit a crime consists of two elements:  a specific intent to commit the crime, and a direct but ineffectual act done toward its commission."  (§ 21a.)  Thus, "[w]hen a defendant acts with the requisite specific intent, that is, *with the intent to engage in the conduct and/or bring about the consequences proscribed by the attempted crime* [citation], and performs an act that 'go[es] beyond mere preparation . . . and . . . show[s] that the perpetrator is putting his or her plan into action' [citation], the defendant may be convicted of criminal attempt."  (*Toledo*, at p. 230.)

Applying these principles to the crime of making a criminal threat set forth in section 422, *Toledo* stated the crime of *attempting* to make a criminal threat is committed "whenever, acting *with the specific intent to commit the offense of criminal threat*, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action."  (*Toledo*, *supra*, 26 Cal.4th at p. 230, italics.)  "[I]n view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury *with the further intent* that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to

15

reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety." (*Ibid.*, italics added.)[7]

*Toledo* gave several illustrations of the circumstances in which, "a fortuity, not intended by the defendant, . . . prevented the defendant from perpetrating the completed offense of criminal threat itself," so that the applicable offense was an *attempt* to make a criminal threat. (*Toledo*, *supra*, 26 Cal.4th at p. 231.) Of particular relevance here, *Toledo* explained that "if a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety *even though, under the circumstances, that person reasonably could have been placed in such fear,* the defendant properly may be found to have committed the offense of attempted criminal threat." (*Ibid.*, second italics added.)[8]

---

7    As we have explained, the crime of making a criminal threat in violation of section 422 includes each of the following five elements: "(1) . . . the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) . . . the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) . . . the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) . . . the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) . . . the threatened person's fear was 'reasonabl[e]' under the circumstances." (*Toledo, supra,* 26 Cal.4th at p. 228.)

8    Similarly, at another point in *Toledo*, our Supreme Court described the situation in which an *attempted* criminal threat has occurred because "the victim for some reason does not actually suffer the sustained fear that he or she reasonably could have sustained under the circumstances." (*Toledo*, *supra*, 26 Cal.4th at p. 234.)

16

2.    *The Trial Court's Instructions*

In this case, the trial court gave two instructions relevant to the crime of attempting to make a criminal threat.

First, the trial court instructed the jury with CALCRIM No. 252 on the union of act and intent. As relevant here, the instruction stated that certain of the charged crimes, including the crime of attempting to make a criminal threat, required a specific intent. It further stated, "For you to find a person guilty of these crimes, that person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state. The act and the specific intent or mental state required are explained in the instruction for that crime."

Second, the trial court instructed the jury with a specially-drafted instruction titled "Attempted Criminal Threat." In its entirety, the instruction stated:

"The defendant is charged in Count 6 with attempting to make a Criminal Threat in violation of [sections] 664/422.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Christopher Lindsey;

"2. The defendant made the threat orally;

"3. The defendant intended that his statement be understood as a threat;

" 4. The threat was so clear, immediate, unconditional, and specific that it communicated to Christopher Lindsey a serious intention and the immediate prospect that the threat would be carried out;

17

"Someone commits an act *willfully* when he or she does it willingly or on purpose.

"In deciding whether a threat was sufficiently clear, immediate, unconditional, and specific, consider the words themselves, as well as the surrounding circumstances.

"Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act.

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

These are the only two instructions that the trial court gave on the crime of attempting to make a criminal threat. Although a standard form jury instruction exists (CALCRIM No. 460) regarding the requirements for finding a defendant guilty of an attempt to commit a crime, the trial court did not instruct with it.[9]

> 3. *The Instructions Did Not Set Forth All the Required Elements of Attempting to Make a Criminal Threat*

As we will explain, we agree with Herrera that these instructions did not adequately inform the jury of all of the required elements for the crime of attempting to make a criminal threat as set forth by our Supreme Court in *Toledo*.

"The trial court must instruct even without request on the general principles of law relevant to and governing the case. [Citation.] That obligation includes instructions on all of the elements of a charged offense." (*People v. Cummings* (1993) 4 Cal.4th 1233,

_____

[9] CALCRIM No. 460 states in part that to convict a defendant of an attempt to commit a target offense, "the People must prove that: [¶] 1. The defendant took a direct but ineffective step toward committing [the target offense]; [¶] AND [¶] 2. The defendant intended to commit [the target offense]."

18

1311.) "[J]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution." (*People v. Flood* (1998) 18 Cal.4th 470, 491 (*Flood*).)

As *Toledo* explained, the crime of attempting to make a criminal threat is committed only if the defendant "specifically intends to threaten to commit a crime resulting in death or great bodily injury *with the further intent* that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution *so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety*." (*Toledo*, *supra*, 26 Cal.4th at pp. 230-231, italics added.) The instructions in this case simply do not refer to the concept of sustained fear.[10]

The jury was therefore not instructed as to every element of the crime of attempting to make a criminal threat, which relieved the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense, and accordingly

_____

[10]    We are aware that the issue of how to interpret *Toledo*'s comments about the sustained fear requirement for the crime of attempted criminal threat is currently pending before our Supreme Court with respect to whether it must be *reasonable under the circumstances* for the victim to be in sustained fear, or, in contrast, whether it is sufficient that the defendant *intend* to create sustained fear in the victim, *whether or not* such fear would be reasonable under the circumstances. (See *People v. Chandler* (2012) 211 Cal.App.4th 114, review granted Feb. 13, 2013, S207542; *People v. Jackson* (2009) 178 Cal.App.4th 590, 599 (*Jackson*).) We need not and do not take a position on the issue. Here, regardless of the proper wording of the omitted instructional language on sustained fear, the relevant jury instructions contained *no reference whatsoever* to the sustained fear requirement established by *Toledo*, which was clearly error.

violated Herrera's federal constitutional right to due process. (*Flood*, *supra*, 18 Cal.4th at p. 491.)

4.    *The Error Was Prejudicial*

Finally, we consider whether the error was prejudicial. "A trial court's failure to instruct on an element of a crime is federal constitutional error [citation] that requires reversal of the conviction unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict . . . ." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324, italics deleted; see also *Chapman v. California* (1967) 386 U.S. 18, 24.)

As an initial matter we note that the closing arguments in this case did not alleviate the instructional error of failing to include the concept of sustained fear in the jury instructions for attempted criminal threat. (See *Jackson*, *supra*, 178 Cal.App.4th at p. 599 [observing that "counsel's arguments did not fill the gap" created by the erroneous jury instruction on attempted criminal threat].) In fact, the prosecutor exacerbated the error by telling the jury that the difference between *actually committing* a criminal threat and *attempting* to create a criminal threat is that "[t]he attempt doesn't require . . . sustained fear. That's all. . . . [T]o make it easier, that's just taken out . . . ."

In determining whether an instructional error was harmless beyond a reasonable doubt, we may consider what "the actual verdict returned by the jury in this case" tells us about whether the error may have had a prejudicial effect. (*Flood*, *supra*, 18 Cal.4th at p. 505.)

Here, as we have explained, the incident at Kohl's was the basis for two separate criminal threat counts — the count charging Herrera with making a criminal threat to

20

Carrillo, and the count charging Herrera with making an *attempted* criminal threat to Lindsey. Both Carrillo and Lindsey heard the same threat at the same time from Herrera, as he said that he would put a "hole" in them if they did not let him leave. Also, both Carrillo and Lindsey testified that they were scared during the incident, and after Herrera left, both Carrillo and Lindsey believed that they were no longer in danger. Defense counsel argued that the jury should acquit Herrera on the counts arising out of the threat to Lindsey and Carrillo because the threat was conditional and Herrera did not communicate a "serious intention" to carry it out.[11] However, only as to the threat against Carrillo did defense counsel discuss the concept of whether the threat created sustained fear. The jury was *unable to reach a verdict* on the count alleging that Herrera made a criminal threat to Carrillo, but it did reach a verdict of guilt on the count alleging an attempted criminal threat to Lindsey.

In light of the fact that (1) Carrillo and Lindsey endured the same threats from Herrera at the same time; and (2) the main legal distinction made during closing argument regarding the attempted criminal threat was that it did not require a finding on sustained fear, it is possible that the only reason the jury was able to reach a verdict of guilt on the attempted criminal threat count was that the trial court erroneously omitted the concept of sustained fear from the jury instruction for that count.

---

[11]　These arguments were based on the instruction requiring a finding that the "threat was so clear, immediate, unconditional, and specific that it communicated to [the victims] a serious intention and the immediate prospect the threat would be carried out."

21

The evidence presented at trial also leads us to find a reasonable possibility that the jury would not have reached a guilty verdict on the attempted criminal threat count if it had been instructed on the element of sustained fear. If fully instructed, the jury would have been informed it could convict Herrera of attempting to make a criminal threat to Lindsey only if Herrera specifically intended to make a threat that could reasonably cause Lindsey to be *in sustained fear* for his safety. (See *Toledo*, *supra*, 26 Cal.4th at pp. 230-231.)[12] In light of the evidence, a reasonable juror could easily conclude that Herrera *did not* make the threat with that specific intent. The evidence unambiguously showed that Herrera threatened to put a "hole" in Carrillo and Lindsey only so that they would let him leave the security office. A juror could conclude that in making such a threat, Herrera specifically intended to create fear that was only momentary and fleeting, lasting only long enough to cause Carrillo and Lindsey to step aside and let him leave, and that Herrera never intended to cause *sustained* fear in his victims.

In sum, we conclude that the erroneous jury instructions on attempted criminal threat may have contributed to the verdict of guilt on count 6. As the error was prejudicial, we reverse Herrera's conviction in count 6 for attempting to make a criminal threat against Lindsey.

---

[12] We have only *generally* described a more thorough jury instruction including the requirement of sustained fear, as we do not intend to take a position on the issue currently before our Supreme Court (see fn. 10, *ante*).

C. *Instructing the Jury With CALCRIM No. 361 Did Not Constitute Prejudicial Error*

Over defense counsel's objection, the trial court instructed with CALCRIM

No. 361, which states:

> "If the defendant failed in his testimony to explain or deny evidence against
> him, and if he could reasonably be expected to have done so based on what
> he knew, you may consider his failure to explain or deny in evaluating the
> evidence.  Any such failure is not enough by itself to prove guilt.
>
> "The People must still prove guilt beyond a reasonable doubt.
>
> "If the defendant failed to explain or deny, it is up to you to decide the
> meaning and importance of that failure."

According to Herrera, the trial court erred in giving this instruction because he testified

extensively at trial, and at no point in that lengthy testimony did he fail to explain or deny

adverse evidence against him.

We begin our analysis by focusing on *People v. Saddler* (1979) 24 Cal.3d 671

(*Saddler*), which considered a predecessor instruction to CALCRIM No. 361, namely

CALJIC No. 2.62.  In *Saddler*, our Supreme Court explained that the trial court has a

duty " 'to refrain from instructing on principles of law which not only are irrelevant to the

issues raised by the evidence but also have the effect of confusing the jury or relieving it

from making findings on relevant issues.'  . . .  'It is an elementary principle of law that

before a jury can be instructed that it may draw a particular inference, evidence must

appear in the record which, if believed by the jury, will support the suggested

inference . . . .'"  (*Id*. at p. 681, citations omitted.)  In determining whether the trial court

erred in instructing on the defendant's failure to explain or deny, the appellate court must

"ascertain if defendant . . . failed to explain or deny any fact of evidence that was within

23

the scope of relevant cross-examination." (*Id*. at p. 682.) "[C]ontradictions between [the defendant's] testimony and that of the prosecution witnesses . . . is not a failure to explain or deny." (*Ibid*.) The instruction should not be given if "[t]here appear no facts or evidence in the prosecution's case within [the defendant's] knowledge which he did not explain or deny" and "[t]here is no indication that he failed to disclose any facts within his knowledge that would have shed further light on the [charged crime]." (*Ibid*.)

In evaluating whether a defendant failed to explain or deny evidence against him, our Supreme Court has disapproved taking a "hypertechnical view of the evidence" by focusing on narrow facts that were not addressed in the defendant's testimony even though the defendant "testified to an alibi, to being elsewhere; he gave a full testimonial account of his whereabouts in the critical time and, thus, in effect denied the charged offense." (*Saddler*, *supra*, 24 Cal.3d at p. 683.)

Here, as we have explained, Herrera testified at length, explaining his actions and motivations during both of the incidents. The Attorney General argued that Herrera purportedly failed to address two factual issues, but that argument might be described as taking a hypertechnical view of the evidence in light of Herrera's comprehensive testimony giving his full account of the relevant events.[13]

---

[13]    The People identify the following facts that Herrera purportedly failed to address: (1) why he did not call the police at his first opportunity after leaving the apartment where he fought with Duncan; and (2) why he did not disclose in an interview with police that he picked up scissors during the altercation with Rassel. We note, however, that Herrera *did* address these issues to some extent. He answered the prosecutor's question about why he ran away and did not call 911 after the incident at the apartment by saying that he was "scared" and by admitting that he hid from police, in part, because he did not

24

However, we need not, and do not decide whether the Attorney General is being hypertechnical, because even if the evidence did not justify an instruction with CALCRIM No. 361, any such error was harmless. Error in instructing with CALCRIM No. 361 is subject to a harmless error analysis to determine, under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, whether it is reasonably probable that a result more favorable to the defendant would have been reached if the instruction had not been given. (*Saddler*, *supra*, 24 Cal.3d at p. 683.)

As explained in case law discussing the predecessor instruction to CALCRIM No. 361, courts routinely find that it was harmless error to give an instruction on defendant's failure to explain or deny where not warranted by the evidence. (See *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472 [collecting cases under predecessor to CALCRIM No. 361].) This is mainly because of the neutral language of the instruction itself. The language is neutral in that it does not instruct the jury that the defendant failed to explain or deny evidence. Further, it is neutral in that it does not direct the jury to take a specific view of a defendant who fails to explain or deny evidence against him. Instead, the instruction expressly leaves to the jury's discretion the significance of the defendant's failure to explain or deny. In most cases, as here, the jury is instructed, pursuant to

_____

want to get himself in trouble. Further, although defense counsel's questioning was inartful in that the direct question posed to Herrera was why he failed to tell the police that he grabbed a *fork* during the incident at the apartment, Herrera testified that he failed to make that disclosure to the police because he was tired and "couldn't really think straight" when he was being questioned. In context, the inference from Herrera's testimony was that he was claiming the same explanation for failing to mention the scissors during the same police interview.

CALCRIM No. 200, to disregard any instruction that does not apply to the facts of the case. Thus, we must presume that the jury disregarded CALCRIM No. 361 if it perceived no evidence of Herrera's failure to explain or deny. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."].)

In sum, we find no indication in the record that a result more favorable to Herrera would have been reached if the instruction had not been given. Accordingly, we reject Herrera's argument that the trial court prejudicially erred by instructing with CALCRIM No. 361.

D.      *Herrera's Challenge to the Self-defense Instruction Has Been Forfeited*

Herrera's final argument concerns the jury instructions on self-defense, which applied to the count charging him with assault with a deadly weapon on Duncan.

The jury was instructed pursuant to CALCRIM Nos. 875 and 3470 that for the offense of assault, the People had the burden of proving that Herrera did not act in lawful self-defense. The trial court also gave a special instruction using language derived from *In re Christian S.* (1994) 7 Cal.4th 768 (*Christian S.*) to limit the application of the self-defense doctrine. (*Id.* at p. 773.) The special instruction stated, "Self-Defense may not be invoked by a defendant who through his own wrongful conduct (e.g., the initiation of

physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified."[14]

Herrera claims that the special instruction was incomplete because "it fails to explain that some force is not legally justified." Relying on case law arising in the context of citizen arrests and imperfect self-defense, he argues that Duncan would not have been *legally justified* in detaining or attacking Herrera after finding him burglarizing the apartment if Duncan used excessive force against Herrera. (See, e.g., *People v. Adams* (2009) 176 Cal.App.4th 946, 952-953 [a defendant may use self-defense against a citizen's arrest accomplished by excessive force because the use of excessive force is a public offense]; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1180 [doctrine of *imperfect* self-defense "is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant"].) Based on these cases, Herrera contends that the trial court should have instructed the jury that it "could still find self[-]defense if it felt that the force used against [Herrera] was excessive."

Although Herrera attempts to frame his argument as a claim that the special instruction was legally incorrect, his argument is more accurately described as a claim

---

14      The language from *Christian S.*, on which the instruction was based, states as follows: "It is well established that the ordinary self-defense doctrine — applicable when a defendant *reasonably* believes that his safety is endangered — may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.)

that the special instruction should have been *expanded and clarified* with an explanation of circumstances under which a victim's violent response is not "legally justified." In substance, Herrera is claiming that although the special instruction was "correct as far as it goes," it should have defined the term "legally justified" to inform the jury that one of the circumstances in which a victim is not "legally justified" in his response to an assault or the commission of a felony is when he uses excessive force.

As we will explain, we need not and do not determine whether the instructional clarification that Herrera attempts to derive from case law on citizen arrests and imperfect self-defense is an accurate statement of the law of self-defense in the context of a burglary. We agree with the Attorney General that Herrera has forfeited the claim of instructional error.

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) Although, this rule does not apply where appellant is claiming the instruction was incorrect and that his substantial rights were violated (*id*. at p. 1012), as we have explained, the substance of Herrera's argument is *not* that the instruction was an incorrect statement of the law. Rather, he contends that the term "legally justified" in the instruction should have been clarified to explain how it applies where a victim uses excessive force.

Despite Herrera's suggestion to the contrary, our review of the record unambiguously shows that defense counsel made no objection to the special instruction

28

and did not request that it be clarified or augmented to include the concept of excessive force. Indeed, although it was the prosecutor who drafted the special instruction, it was defense counsel who suggested the need for the special instruction.[15] The record simply contains no indication that defense counsel had any problem with the content of the special instruction or believed that it should be expanded or clarified. Therefore, Herrera's argument that the special instruction should have been expanded or clarified to discuss the concept of the victim's use of excessive force has been forfeited.

---

[15] Specifically, during discussion of the proposed jury instructions, one issue was whether the concept of self-defense was applicable to Herrera's assault on Duncan. Believing that self-defense might not normally apply to an assault committed in the course of a burglary, counsel and the trial court discussed the possibility of deleting the fifth element from the crime of assault set forth in CALCRIM No. 875, which states that "[t]he defendant did not act in self-defense." Defense counsel prevailed in convincing the trial court that under the factual scenario described in Herrera's own testimony, in which he claimed he did not burglarize the apartment, but rather was tackled by Duncan and pushed inside, the concept of self-defense could apply. The trial court ruled that it would instruct on self-defense, and defense counsel then asked: "Do we then need to clarify that . . . if you believe the other way around, in other words, if you believe he committed a burglary then, therefore . . . ." The trial court finished the thought: "Then he has no right to self-defense. You can arrange that, yeah." The court invited counsel to prepare an instruction. The prosecutor prepared the special instruction using the language from *Christian S.*, *supra*, 7 Cal.4th at page 773, footnote 1, and defense counsel "submit[ted]" without objecting.

## DISPOSITION

The judgment of conviction is reversed as to (1) count 4, under which Herrera was convicted of making a criminal threat (§ 422); and (2) count 6, under which Herrera was convicted for attempting to make a criminal threat (§§ 422, 664). In all other respects, the judgment is affirmed.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.